Case number 24-5205, KashiEX LLC v. Commodities Futures Trading Commission, DeBalance. Mr. Schwartz for DeBalance, Mr. Roth for the FOX. Good afternoon, your honors. May it please the court, I am Rob Schwartz. I am the general counsel of the Commodities Futures Trading Commission for DeBalance. First of all, I want to thank you for holding this hearing this afternoon. These are important issues. And the district court issued a seriously flawed decision that if it goes into effect, would let Kashi immediately open its futures exchange to high stakes betting on the congressional elections in November. And when I say high stakes, I mean high stakes, $100 million maximum. That $100 million can be bet on the exchange. That was stated in Kashi's brief, but that's not correct. It's a wealthy individual qualifies as what's called an eligible contract participant. So they are, a wealthy individual is eligible to bet up to $100 million, as is a corporation. I assume it would be easy enough for a wealthy individual to form a corporation, but they fall within the definition of eligible contract participant anyway. So that market would open immediately. And Kashi has also announced plans for a betting market on the presidential election. A competitor followed suit and announced its own plans for a betting market on the presidential election. And that competitor called ForecastX also announced plans for markets on individual Senate races. If that happens, the harm to the public is going to be profound at a time, and I don't mean to be dramatic, but Americans broadly believe that our democracy is under threat before this court even has an opportunity to consider the issues, to fully consider the issues anyway. And unlike Kashi, we've substantiated our claims of harm. Kashi's claims are entirely unsubstantiated, and by comparison, they are minor. Can you explain the harm? Because it's just not clear to me how manipulation of this event contract market would affect elections or election integrity. Right. I want to start with the manipulation because that was your question, but election integrity is a whole different ball of, and it relates, but there's a lot of other aspects to that. But the market manipulation, look, if people, as Kashi says, look to these markets for important information about an election, if somebody distorts the market to make it look like one candidate or another is doing better or worse than they are, that could affect allocation resources, volunteers, turnout, who knows? Is that true? Because if you believe that if somebody is, I guess, making a bet for reasons other than the bet being correct, somebody will take the other side and eat their lunch. It's not what's supposed to happen. Yeah, that's what's supposed to happen. But these election markets are uniquely susceptible to manipulation that can't be corrected like that. And it's because the sources of information that they absorb and reflect are opaque and unreliable. I am talking about polls with undisclosed methodologies or with bad methodologies, fake polls, bolsters with agendas, inaccurate news, fake news, on and on. A normal futures contract will have an objective indicator that is reliable, some kind of a published index, a government report. This is a unique kind of market. And we would give examples of betting markets on political candidates being manipulated, but those were just a sample. We also cited a University of Missouri Law Review article that lays out very well, I think, the problem of fake polls and the connection to these betting markets. So is your theory of irreparable harm that this market will be manipulated, or is it the connection to the larger election and election integrity? It could be either, right? I mean, the market being manipulated would be a harm to the participants in the market, and it could be done in a way that harms election integrity. Talk about the election integrity. Yeah, I think, to me, to my mind, the more immediate concern is the perception of election integrity, and that's important, right? This is not a hypothetical that people would be... We have 600 comment letters cited in the order and in the administrative record expressing exactly this concern, that betting on elections will undermine election integrity. And those 600 are entirely a group of people who might ever respond to a CFTC request for comment. It's fair to assume that there are many, many more out there who would feel the same way. And again, I don't want to be too dramatic, but we live in a country where tens of millions of Americans believe the last presidential election was stolen. Last week, there was an assassination attempt, the second three months on one of our... But can you be more specific about how this market is connected to election integrity? I mean, you know, Kelsey argues that there are other markets already trading in this, these are common in Europe. I understand that election integrity is important and that the perception of fairness of election is important. I think the point that you need to make is how a market is going to affect how people vote. People have enormous incentives to advance their political interest. Some people do. And it's unclear to me why and how you think markets in these event contracts would affect the election itself. Well, I think Your Honor put her finger on it when she said that people will go to lengths to advance their political agenda. If there is a hundred million dollars to be made, it is entirely imaginable to organize a group of people to engage in maligned behavior, to mess with... Organize the voting for a candidate. How could voting, people can vote for whatever reason they want. How could people, decisions to vote, you could vote because, you know, it says you should, you could vote because you had a dream, you can vote because, you know, you flipped a coin that morning. Absolutely true. But our administrative record contains hundreds and hundreds of letters from Americans who are concerned about that, who are concerned that the elections will not reflect the true political will, that there will be other incentives that would destroy what these markets are supposed to be. Maybe a comment letter, but you have a finding that this is going to happen, particularly given that it's predicted is already operating out there doing this very thing. I get it not on a licensed exchange. And then is it right that the University of Iowa is doing this too? So that's two questions, I think. Yes, it's in the order that the commission issued based on that and other things, the comment letters and other things about concerns. I mean, the fact that you get comments, it's not, all kinds of comments come in and I'm not dismissing the concerns or validity whatsoever, but what we need is, I don't think it ever counts as irreparable harm to say that we got lots of letters from people who think this is a bad idea. No, I mean, in this case, I see it as evidence that there will be a problem with perception of election integrity, because we have people telling us that they would have a problem believing that the elections have integrity if high stakes gambling starts to take place on the market. I didn't tell you that, so I'm not sure what to do with just saying you have a lot of letters. Like in more concrete terms, so Predictive has been operating since the 90s, is that right? Since 2014. Predictive has a limit of $850. It is small scale, there are low position limits. It operates by a no action letter issued to the University of Victoria in New Zealand. It's supposed to be, it's non-profit, it's supposed to be, it's supposed to be for academic purposes. It bears very little resemblance to what CalSheet proposes to do here and does not- Same thing with the lower dollar limit. Is there any other difference? It is a much lower dollar limit, much lower position limits. They're not supposed to advertise, and the fact that it's supposed to be for academic purposes, and the University of Iowa is- The academic purpose is just to assure the people who write the letters to you, but you say they're not supposed to advertise. Have they advertised? I'm not aware of it. Okay, so they're not advertising, they have a much lower limit. Yeah, it's not the same sort of corrupting- Isn't there a limit on the number of contracts? There is a limit on the number of contracts. Is it true then that what you're really focused on is the dollar amount? Because you gave a no action letter to predict it, so just the mere fact of, I guess, betting on elections was not objectionable to you. So is it just the dollar amount that's a problem here? Well, it was subject to, that's certainly part of it. It was, the predicted no action letter was subject to these kinds of conditions because, exactly because the theory was that it wouldn't have the sort of either corrupting influence or the potential for the perception of corrupting influence. So it's a much smaller scale thing. I don't think it's comparable. I don't think polymarket, which is prohibited from doing business in the United States, is comparable. And I also don't think- So do you think polymarket is having the distorting effects that you fear? I am not aware. I think if you, because polymarket is not allowed to do business in the United States, I think if you went out in the street, maybe in a different city than Washington, DC, and asked 10 people, do you know what polymarket is? I think you'd have nine or 10 people who would say no. Actually, his planning, their declaration says that they've reserved, they've committed $1.5 million for advertising. People are going to know. $1.5 million is not very much money for national advertising to affect a campaign. Yeah. I don't know how much they cost during the debates, but that would be a- But the things that you fear have not been caused by polymarket, because American investors can invest in polymarket by using a VPN. There may be, they read in Bloomberg that there are some number of people who are willing to use a workaround to use polymarket, but that's a different type of person who would follow the rules if there was something else that they wanted to do this activity, but maybe wouldn't use a VPN to get onto polymarket. I would like to understand the relationship between the article that you pointed to about this recent failed attempt to manipulate a polymarket contract, where the underlying was itself an election vetting contract, so that was like a contract on top of a contract, right? Because they were trying to manipulate a polymarket contract, but it was a three-hour window, and as I understand it, the primary product that Kalshi is wanting to sell is a contract that would come due on the date of the election, when the election results are known. Would their ability to put out that contract imply that they would do this, these shorter-term contracts? I'm wondering about how relevant, applicable to their product is this effort to affect a three-hour window, which was basically the effort, I gather, to pump up the price of an overlaying contract. That was closer to a traditional market manipulation, open market manipulation, is what we would call it. Things like the Kid Rock versus Senator Stabenow poll is not. I mean, it went right in the chat in Unpredicted, I believe, and Kalshi runs a similar thing. If you're like me, and you're somebody who, in election season, refreshes the 538 webpage every day, you see that there's a lot of posters that you don't recognize, so it's very easy to imagine people putting out a poll that is taken seriously. I just had a specific question, because I'm trying to understand the dynamic that is, I gather, very familiar to you, that how would... If I bought a contract that was short or long on one of the houses of Congress going a particular way, I gather that you're saying as a factual matter that having these... I would be waiting until that happened, and I'm not sure what I would be manipulating in between. If I was a voter and I had a political orientation, I'd presumably be doing all the things that I cared about as well. I don't do any of those things because I'm a federal judge, but it sounds like the creation of these incentives for short-term information manipulation depends not just on their basic product, but on there being a market for shorter term pricing, and is that just the nature of... The price for their product goes up and down? Yeah, I understand. Yeah, the price of the product goes up and down, and there would be speculators that would come in and out of the market, in and out of the market, that could be financially injured by something like that. And so it's not that it would be all buy and hold. So I would buy on day one, and then I would try to rev up the price and sell on day three. And the idea is that anybody holding any position in this market could be trying to push the market in some short-term way that could affect things like early voting, absentee ballot voting, people's sense of whether it's worth it to go out and do grassroots election work, that illusory dips and jumps in the chances of one or another house being controlled by one or another party could have effects on people's actual political behavior. That's the theory. I couldn't have said it better. Thank you. Can I ask you, is what PREDICTED is doing, so it doesn't advertise as a different purpose and has a lower dollar amount, is it nonetheless under the Commission's theory an activity that's unlawful under state laws against election gambling or gaming? You know, I would leave that to the states to decide. It certainly seems similar. No, no, this is your whole theory against them, is that it qualifies as gaming or, it feels to me like the same thing again, you can tell me if I'm wrong, but gaming that's outlawed by state law. Interesting. So this provision applies only to registered designated contract markets, so that wouldn't directly apply to PREDICTED, which is not. Why do they need a no action letter from you if you don't regulate their market? The no action letter is so that they won't have to register and be regulated. And it's at the time that was deemed acceptable because it was. So if you just said they don't have to register and then they'd be fine? The staff issued a letter that said we won't recommend an enforcement action solely for the reason that you haven't registered as an exchange. I'm trying to figure, I know, so I'm trying to understand. But in your view, what PREDICTED's doing, if your view is that lots of states ban gambling on elections, then PREDICTED, which is based where? You know, I hadn't thought about it, but now that you're saying it, PREDICTED's lawyer may well be in the room. So it may well be a violation of state law to do that. I don't know. I assume that their lawyers are good enough to have looked into that. Why do you say these harms that you've been mentioning, selection integrity, manipulation, does it change just because they're on a licensed exchange? I'm sorry, is it registered or licensed? I'm not quite sure. Well, designated. Seal of approval. It's the size. It's the dollar amounts. It's those things. I don't know if we would get out the same no-action letter today if someone like PREDICTED came to us, but that doesn't really matter right now. But I know that somebody like CALSHI proposing what they're proposing would not get a no-action letter. Sometimes you talk about in your briefs that those are different because this is a designated, approved exchange. And I don't know if that's just a legal argument as to why we're talking about the statutory provision and don't have to do that for PREDICTED, or does that bear on your assessment of harm? That's what I'm trying to figure out. Part of it is that it gives it a legitimacy. And you think it's going to draw in a lot more money. And so do they, I'm sure. I have some questions about your special interpretation, which I gather the threshold question is, if we don't agree with you, but agree with CALSHI on the meaning of INVOLVED, then you don't have, it doesn't matter what we think on gaming or activities unlawful under any certified law. I think that's right. The error that the district court committed about the word INVOLVED permeates the entire opinion. It is just, the word is not connected to the part of the statute that talks about the underlying. So if you're right about INVOLVED, that it, that the statute applies to a contract that involves an enumerated activity, both when the activity is the underlying or when the contract itself relates to, or entails, or has essential features or consequences touching on that enumerated activity. So it's both, it's the underlying or the event contract that involves one of the enumerated activities. If that's right, and you're applying it to the enumerated activity of something that's unlawful under any state law, CALSHI argues that that would allow the permission to subject any event contract to public interest review under the special rule because there are states that law event contracts generally. That's their argument, but that's not what the commission did. The commission decided the case before it. It cited a variety of sources. State laws made sense because states are the almost exclusive regulators of gaming, and it applied the prong that said wagering a sum of money on a contract. I'm not talking about the gambling part. I'm arguing that some state laws outlaw wagering on elections. CALSHI comes back and says, well, if your idea of involving is right, that involving could mean the contract rather than just the underlying, there are state laws that outlaw event contracting in general. If that is a trigger under your interpretation of involving as applied to unlawful under state law, if that is a trigger for public interest review, then there is no event contract over which you don't have at least the option to exercise public interest review. A, does that make all the enumerated categories unnecessary? B, is that in conflict with the Modernization Act, which said, no, you don't have to do public interest review for everything? I thought you had some distinction between state law that is directed at event contracting and state law that is making some substantive other independent unlawfulness determination, but I'm not hearing that. Right. But what I'm understanding, Calshi, to be saying is that if you have a gambling law that prohibits wagering on a contingent event, then that can't be unlawful because if you put it on designated contract market, the CEA preempts whatever the state law that generally prohibits wagering on contingent events. But these are election integrity laws. A lot of them you'll see, there's a long footnote in the order, are in the election laws of some of these states. An interesting one to me is the Wisconsin law, and the penalty for betting on an election is that you can't vote in that election. So I'm not at all sure that if you are wagering something on a designated contract market, I don't know what Wisconsin would take about that. You might well still be violating Wisconsin law, but that's not- You've looked to state laws to determine whether you have the opportunity to do public interest review. It would really be helpful to know the commission's view. What is the difference in terms of identifying activity that's unlawful under state law between laws that ban election betting and laws that ban all event contracts? I take it you don't think, or do you think you have authority to, given that there are state laws that ban all event contracts, to review all event contracts? No. Okay. So what's the difference between those and state laws that ban election betting in terms of triggering the public interest review? Yeah. A different category of activity. I think we're all agreed that the federal statute preempts anything that the state could have to say about what would otherwise be an illegal bet on an exchange. That's an argument that's confusing because- Well, maybe that is the answer, but- I think we both agree on it. I'm not quite getting there. Well, if you're looking ex ante, you haven't yet authorized the thing that's being proposed, right? So there's no preemption taking place. And you're looking at the field of state law to say, what are the kinds of things that might be really contrary to the public interest? Well, we've got assassination and war and terrorism listed, but let's also look at state laws and what are other kinds of things that might really be contrary to public interest? And there's nothing that's been preempted yet. You're looking at and saying, is this something that we should take up and look at under public interest review? Yeah. I think the way the process works is the issue here. There is no obligation on the part of any exchange to get sign off from the CFTC before listing a product, unlike the SEC, where if you're going to put a security on a national securities exchange, you have to have it approved. But there's a process called self-certification. Right. So I can send a notice filing over to the CFTC before they open a business on Monday, I can list the contract on Tuesday. So it's almost always, it's a retrospective look. And it's what happened here. The Cal sheet made its notice filing and the CFTC initiated the process of reviewing it. But that's the exception. My understanding from your brief, I thought your position was that you're not relying on general state laws that say you can't gamble on this, that, and the other thing, because that's preempted by the CEA. But there are statutes that separate and apart from just gambling on any old thing that are not preempted because I thought you said that it advanced other state interests, such as the state election integrity. There's a separate statute that says you can't bet on elections. So that's why I read your brief to be saying that's why it's different from what Judge Cohen posited. It's not just general, you're not relying on all gambling is illegal under state law. You're relying on there's a separate interest about not gambling on elections and the state interest is election integrity. Yeah, I think that's right. I mean, historically, the all gambling is illegal under state law is a significant reason that there is a federal regime here, because it is long ago. And I guess what's old is new again. There was a persistent debate about whether trading futures was just gambling and it ought to be illegal. So there are laws under state law that would ban it, but they don't have that impact. You mentioned Wisconsin. Can I just follow up one? So I suspect that the answer is somewhere in there to my question, that we know the sort of ex-ante, the Fremont Futures Act does preempt a state law that categorically bans the activity that the CFTC can regulate, but that it doesn't ex-ante preempt these other, more as Judge Pan was saying, more specific to a particular kind of malign activity or a contract that could be problematic in the state's view. I think that's right. And so you do have some kind of ex-ante idea about preemption of these general anti-event contract laws, but it still makes sense for Congress to have written this list to direct CFTC's attention to contracts or activities that are in violation of state or federal law. Yeah, I agree with that. You mentioned Wisconsin, which defines that as not to include bona fide business transactions, contracts for purchase or sale at a future date of securities or other commodities and agreements to compensate for loss caused by the happening of the chance. So I don't think Wisconsin, I don't understand why you think Wisconsin would even apply to these event contracts. I am looking at the part of the law that's quoted in our order, which- Well, that's a problem. I think when I looked at your order, you just sort of had the wager or that language, but then I've looked at almost all the state laws and the overwhelming majority will, certainly in their definition of gambling generally, will back out business transactions. Some of them say things like event contracts, these types of language that tells me at least that it's quite unclear whether those laws apply. And then even within their election laws, I haven't found any that are clear that they apply or some that many of them have back outs like this Wisconsin one does. Others, it's just unclear whether wager or bet would be interpreted under the statute to apply to hedging economic risk. And so the extent the commission rests its argument on there's some distinct state interest here, but then has not cited statutes that with specificity show me that in fact, states would ban this type of hedging economic risk and call it gambling or gaming. What am I to do with your argument? I don't want to press the issue of the court is is unpersuaded, but I'm asking you, I mean, you all said this is, this is your rationale. So I think you kind of have to pick it. No, no, I understand. I understand. I confess that you may have dug into this more than I have at that grant. I just don't have an answer. I'm not talking about you personally. This is a, there's a decision of the commission itself. That's what we're examining. And that it's that decision that sites lots of these state laws. But if, when we turn to those state laws, the overwhelming majority do not extend to business transactions, including the state, the bar bar gambling entirely do not extend to these, then I'm not sure. Have you shown that there is a violation and there are some that don't have back out language. I want to be fair. It's small. I wasn't understanding the question. And so I think your question would violate, this would violate state law. That's what I'm asking you commission decision. I don't mean you personally violate state law. Yeah. I, I might not have understood the question initially is the assumption is the assumption that because it is an event contract that is traded on the exchange, it would not be covered by it. That would make it a business transaction, not covered by the state law. So I have not researched thoroughly all 50 states law. I'm telling you that textually they say Wisconsin is the one you wanted to talk about. And I read to you at Wisconsin's law says you can't better wager on elections, right? Right. They define bets. A bet does not include, not include bona fide business transactions, which are valid under the law of contracts. I don't think this matters if it's on an exchange or not. Are these bona fide? Have you, I don't see in your record, do you explain why these are not bona fide business transactions? No, it doesn't include contracts for the purchase or sale of future data securities or other commodities. I'm assuming other commodities includes excluded commodities. Maybe I'm wrong, but the commission hasn't shown that agreements to compensate for loss caused by happening of the chance that goes up with that limitation, blah, blah, blah. I'm going to talk about insurance and things like that, but I don't know why that language wouldn't capture this type of hedging against economic risk. And so I'm not sure, and we don't have time for me to go through all the states where there are backouts or languages that to me looks like it could be a back out. And so I'm really just making, asking here whether the commission decision that's given to us has actually shown that any state law would be violated by an event contract that is meant to indemnify against risk. It's not in the order, so I can't tell you it's, I can't tell you. Don't they have to do that? To show that you've got something that you've got a ground for? I think that if it's not correct that some of these statutes apply, then the commission will fail to do something that it is required otherwise to do. Well, then how else do you have any basis for not authorizing? I mean, you have to show a likelihood of success here, per se. And so how can you have a likelihood of success if you haven't I'm not saying whether you could or could not. These state laws could be, it could be court decisions I don't know about, it could be regulatory interpretations I don't know about. But if the commission hasn't done its homework to show that, besides the textual interpretive difficulties that the briefs go back and forth on, that one of these event contracts would in fact violate a state gambling law, including bars against gambling on elections, then how would you be able to succeed? I think if the string site is correct, then it doesn't raise an issue. It's a string site like any... The string site is leaving out all kinds of information. I don't know what you mean the string site is correct. It's leaving out, it cites Wisconsin but it leaves out the definition of that. I mean, I thought your answer had to be, you know, it's not a contract meant to have a significant hedging or price spacing function. It's a little circular to say that it's a bona fide business transaction before it's been reviewed and allowed, right? And it's a little circular to say that it's insurance, I mean, or it's a contract for the sale of a commodity. So I question is, do you have any view on that? I mean, this is an example of the commission feature, you know, why these would be the kinds of election wagering contracts that would be contrary to state law. And from what I glean, it has to do with that these aren't contracts that have an economic function, but are sort of old school, just speculative... Just gambling, yeah. Betting contracts. And who typically is on either side of one of these transactions? Are these business transactions? The commission made its public interest by finding that it's very unlikely that it would be used as a legitimate business transaction or as a hedging transaction on more than an occasional basis. There's a lot of reasons why it wouldn't be useful as a hedging tool. Where is that finding? That is in the public interest finding in New York. How do you know? I mean, if I own a business, a private prison business, I don't mean to pick on any particular company, but I'm trying to think of one that could really change based on I think I'm going to have good business if X party gets into control of the House of Representatives, Senate, White House, and I'm going to be in real trouble because this person has been campaigning against these if that person gets in or this party gets in. How do you know that the people... I mean, I get the point that there may be people that hop onto these exchanges that are not hedging against economic risk. That could happen, I guess, with anything that you have on your exchanges. But how do you... This is what seems to be very difficult because in some legislative history, they say, look, we're concerned. We want to make sure people can hedge against risks that they're facing. So there's a real commercial interest here, and it's not just online gambling. But how do you know? How do we know who's going to buy these contracts if they have businesses that will be very... We can mention a lot of businesses that are going to be very much affected by who controls the House, the Senate, the White House, and they may really need to hedge. And that would be a legitimate event contract if they were hedging, correct? For commercial reasons. If they were, and we put it out for comment, and if all of these businesses had come out of the woodwork and said, we need this for hedging, we may have reached a different result. I can imagine businesses not wanting to go on the public record and say, we need to do this. Again, I don't know... Law firms will sometimes... It doesn't tell me how to interpret a statute. And if the concern here is that... I just don't know on what basis you could find that everybody... I get a concern that a lot of people may jump in who are not doing this for commercial reasons, but I don't know how you sort out, because I can imagine easily lots of people doing it for commercial reasons. Yeah, but we didn't get lots of people, and they've only been able to come up with idiosyncratic examples. Any idiosyncratic? I think it's a little idiosyncratic. I think there's just not that many. I mean, I really... Okay. I'm very surprised. All we can do is to go on the administrative record. You have said it's fine to have event contracts on whether a legislation is going to pass. Is that correct? My understanding is those are already done? The commission has never approved anything like that. Again, it's a self-certification process, so somebody knows what may be out there, but there's no instance of the commission approved. I thought it was in the briefing. Did you guys deny that in the briefing? I could be wrong, but tell me if I'm wrong. They were vague about it. I don't know what they were referring to. So you think if... Gosh, is it idiosyncratic to think that businesses may need to hedge against risk based on certain pieces of legislation passing? They can get an idiosyncratic derivative. They don't need these exchange-traded derivatives. I don't care if they need or not. I'm asking you whether you think that does not count as a type of commercial interest that these exchanges are designed to serve and the legislative history referred to, that that's what they wanted to allow people to do? We're giving no evidence that people who have the ability to engage in those transactions... Are you announcing here that the commission's view is that there can be nothing political? So if people have been doing event contracts on the passage of legislation, those have been unlawful on the same grounds as your position? No. No, not at all. This only applies to... Wait, stop. So if that's not... If that is okay, why is that okay? So passing bills is okay, but elections are not. Why is that okay? The commission has never taken a position on whether anything like that is okay. I mean, all I can tell you is that the statute applies to... We haven't said it's unlawful. We haven't said it's unlawful, no. But you've never heard of this before, that it's happening? You said that they're briefing mistakes. You aren't aware that this has ever happened, then? I've read about it in their brief, but we're not talking about the same kind of product here. This is a fungible... What about if somebody... Who gets nominated to be the Secretary of Agriculture? Or whether the nominee is going to get confirmed? I can imagine, again, enormous interest in companies hedging against risk based on that, based on policies somebody's planning to do. That would not be allowed either under your view, or it would be? I can't say that it wouldn't. I mean, we are talking about the holding here was based on wagering money on an outcome of a contest of others that... What about who's going to be elected the Speaker of the House? I mean, we've had long contests lately on that. I can imagine... It sounds like a contest of others, but I also want to point out that it doesn't... That would be out. Who's going to... No, no. How would it not be? It is a contest of others. It's a discretionary review. The statute says, may determine, is not in the public interest. So anything that's out there that's happening, it does not mean that the commission has given it the seal of approval. It means that it's possible that the commission would commence a review on that and conclude one way or another. I don't know. But the fact that it's out there, it doesn't make it unlawful unless the commission does something. Well, I'm just curious about the basis for your conclusion that businesses would not have economic interests that are affected by who controls the House or the Senate, Congress generally, or who controls the White House. I just find that quite surprising. I would say that- Not on more than- To me, the other matters, political matters, it seems quite clear to me. But I'm not running a business, so maybe I'm incorrect on that. Yeah, the order contains a lot of discussion about how these products are structured, does not really lend itself to hedging these risks very well. I think the commission's position in the order also was that at least this product isn't usefully a hedge because the implications of one or another party being in control of one or another of the houses are very speculative, that you need to know who's in the White House, what legislation's going to be put up, is it going to pass, how much cohesion is there, that it's just a big and ungainly body. And so there may be, as you said, or as the order says, some hedging, but in general, it didn't seem like a particularly principled function for this product. Is that the position that you're defending here? Yeah, I think the order uses the word attenuated.  Or it's predictable or speculative. Can I ask, were any of this raised in the district court? Did anybody argue that the commission's finding that these laws conflict with state laws that outlaw gambling on elections, that that's not supported by the record, or that the commission's finding that these are not really used generally to hedge business risk, that's not supported by the record. Were those things raised or argued before the district court? They certainly argued that some of these examples that were given in the comment letters showed that this could be a useful hedging tool, but they tended to be hypothetical. So was it raised at a general level? Yes. It would have to be hypothetical because it's not operating yet. I think your commenter's telling you that this sounds like a useful tool to me. Sorry, I got too many things going on here at once. Sorry, if I could just get an answer to my question. Right. It has to be hypothetical, doesn't it? If it were a hypothetical coming from the person who wants to use the thing, that would fall into a very different category than Kalsche saying, here's a bunch of reasons why somebody might want to use it. Presumably they're not creating a product without knowing people want it. But it's for gambling. That's the reason. If I could just finish. I guess my line of questioning is more focused on, this was presented to the district court as a challenge under the Administrative Procedure Act that what the commission did was arbitrary capricious. And the claim that was made was that it was arbitrary and capricious because of the way it interpreted the statute as contrary to law. There wasn't a claim that the factual finding that this is not a hedging product, was not supported by the record, therefore was arbitrary and capricious. There was not a claim that the finding that this is contrary to state laws is not supported by the record. Were those claims raised? Yes, they did raise those claims. The district court didn't get there because of the legal determination. They're in the CFTC decision that you actually note that they say the state laws don't, they have a different reading of the state laws than you. That's even in your decision. Sure. Yes. But it was also preserved. That argument was certainly preserved. So both of those arguments are preserved. I think so. The district court didn't reach it. I have a question about the irreparable injury. Is there any evidence as opposed to just reason to believe or hypothesizing, maybe from European countries or other countries that have these products on market, that short-term manipulation of election betting markets do affect election process or outcomes? No. I don't have that. I don't have that evidence. And is there evidence that allowing people to stake money on election outcomes increases, for example, the circulation of false information or the production and circulation of false information? The interest that people already feel heavily non-monetarily invested in that. Right. There's the Kid Rock example again. There have been instances, again, I point to the University of Missouri article that goes through the problem of fake polls. And it ties it in an interesting way to these other markets, these unregistered markets. And then I just had, I think, one more question, which is, is it the commission's position that if you don't succeed in this case under the gaming or unlawful under state law provisions, that the commission would have the authority to promulgate a rule under the enumerated category six, other similar activities determined by the commission by rule or regulation to be contrary to the public interest? Maybe, but this business about what the word involved means could create a very significant problem. Spell that out if you would, because I had the same concern. Right. So I'm thinking primarily about the option of making a rule that says this is similar to the type of activity that is listed. But if it has to be the activity, if the underlying has to be or relate to the activity, you'd have to make the argument that the underlying was related to the activity, that elections are similar to games. Maybe you could do it, maybe you couldn't. In other words, the commission would not be able to promulgate a rule based on the notion that elections are the underlying and elections are somehow contrary to the public interest. We would not be able to make that case, I am sure. It would have to be that they are similar in some respect to- Or that you've prevailed on the involving prong and that event contracts, using event contracts to wager on elections is contrary to public interest in the commissions. Correct, yes. If we have involved back where it belongs, then we're in a much better position to do what the statute says, which is determine if the agreement, contract, or transaction involves. So yes, we would be in a much better position for making if the error about what the word involved does is correct. I thought you had a proposed rule out, am I totally wrong on that? You're correct. What is the status of that? It is, it was proposed, we took comments, the comment period closed, and it's before the commission, I guess it's- Do you have any idea what the time frame is? I have no idea what the time frame would be. I still need some textual help. So these agreements, I'm sorry, I'm just going to call it an event contract. How do you say the short term for agreements, contracts, or transactions? Does that mess you up if I use event contract as a shorthand for those three words? The issue that I'm having with that is that transaction means something different than contracts. The district judge thought not, but it's supposed to be different. So how, I'm going to describe what they want to sell as an event contract. Yes, right. I understand the argument that involved is a broad term, and you have your definitions. Can you explain to me how one of these, when they sell an event contract, it involves, the event contract itself, its underlying activity, which way is the house going to go, is not gambling in violation of state law, right? You don't want this to focus just on the underlying event. No, no, just the- The event itself, right. Correct. Okay, so how does it, just explain to me, very simple terms, how it nonetheless involves, how it's, the word that you had, you know, consequence, how does it come to, even with your definition of involve, how does it become, transform from hedging investment risk to gambling? And put aside even my questions about what, how states define, let's assume states define gambling just the way you want to on elections. How does it become that? The gambling would be the trading of it. The trading of the event contract? Correct. And that's the same as the underlying, isn't it? No, it's the transaction. So, so just selling the event contract is gambling on elections? Yes. And to sell an event contract on another contingency, whether there's going to be a drought, is that gambling too? Gambling in the colloquial sense, or what a state might call- The exact same way you just defined their event contract is gambling. Is this gambling too? No, because it can't capture every contingent event. Okay, so help me, because this is what I'm struggling with. What makes it gambling under CAUCI event contracts, but not under there's going to be a drought? My simple brain has not followed that argument closely enough. Maybe they still have it. Because the only thing the commission said about the definition of gaming is that it is wagering money on a contest of others. So, the question of whether there's going to be a drought- It's not gaming. Are we talking about gambling? Because gaming is not always a contest of others. It's not always a contest of others. Right, okay. So, sorry. So, if it's two people contesting, I mean, I just don't understand what you mean a contest of others. Well, an election is a contest. A sporting event is a contest. A award show is a contest. That's sort of what it can't cover. And it doesn't need to, based on anything the CFTC did, is just any old contingency. They don't claim it did. That's not what the commission said. Is this bill going, is the president going to sign this bill, or will the Speaker of the House, who's of the same party, talk him out of it, her out of it? Well, I certainly don't- Is that a contest of others? It's not obvious to me that it is. It doesn't sound to me like it is. Right. Two people fighting for different outcomes. It seems more attenuated to use the same word. So, how do you, can you help me with a clear understanding of what contest of others is so that we will know? Because their argument is, under your reading, it's all gambling, right? Their argument is that it would capture any contingency. The only thing that the CFTC decided was that Calshy's contracts were a contest of others. The statutory language in a way that has, or at least we do, that has integrity. We can't just say, this is a ticket good for one day, one way only. So, what is the interpretation that you're asking us to say, to say is correct under the statute that captures Calshy, not who's going to be Speaker of the House? Are you asking me more about what a contest is? Yeah, I'm asking, I said, how do you define contest of others? Is that your word? Of others, because it's not in your, you have no control over it. So, a contest of others. All contingencies presumably are things you have no or very little control over. Well, if you were in the contest, if you were in the contest, you might have some control over it. Wait, so contest is not a contingency because folks might have some control over it? Is that the difference? It would not fall within this category of commodities, if one party had control over it, excluded commodities. I believe, I wish I had my CEA in front of me, but that's- I got your copy that you gave us. Yes, no, but that's not going to help me with the definition of excluded commodity. I can tell you that we don't usually think of things where one party has some control over it similar to what we're talking about here. Okay, so now this is very helpful. So, you're saying that I had not gotten this from the briefs, and I'm sorry if I missed that, I hadn't gotten from the order, that it's the definition of excluded commodity that does not include a contest of others, where those others have some control over the outcome? I would like to sit down and look at my CEA. I believe that's the case. I think it has to be out of the party's control. It's not in the handout that I filed before the order. Okay, maybe on rebuttal, you can help me understand that. So, okay. Along these lines, what is the difference between the underlying and what they're involved in, in your view? Because you're saying that those have to be two different things. The underlying is what's based on, and what they're involved in is a separate thing. What's the difference? The difference is based on is only referred- What is the underlying? Right. Based on- I'm asking, what is the underlying? In this case, the underlying would be the elections, those events. Those are events. And then what is what this is involved in? Wagering on them involves gaming, and that is the purpose of the contracts, which means it involves gaming. That's what they're for. And it's wagering because you don't think people are hedging risks, or is it wagering because it's a contest of others? Or what is the reason we think this event contract is wagering, but the one about droughts isn't? I'm sorry. Forgive me. I didn't follow the- I lost the thread. So you said that the underlying is the election that you told us, and this is a problem because it involves gambling. Right. And that is because, that is because- Oh, it's wagering on a contest of others. I don't mean to keep going in circles, but those are the state law definitions that we look to. And this reflects the real world. The Nevada Gaming Commission has jurisdiction over election gambling. It's illegal there. MGM and FanDuel- How do you decide, wage, or bet under these? As I said, that's actually a much more complicated question, so it's not totally clear. But it would ban these. This is how- I'm speaking of the subject of election gambling. I mean, in common parlance, this is gaming. MGM and FanDuel run these platforms where you can bet on elections overseas. You can't access them in the US. Okay. Do you have one question? I guess I'll just take one last shot at this. So underlying is the election. What it's involved in is wagering on the election. And I guess the question we're all trying to get at is, how is wagering on elections different from wagering on other things? Because if wagering generally is something that's involved in gaming, then every event contract is subject to regulation. So what's the, I guess, simple answer to that? The simple answer is that if presented with a case that did not involve a contest of others, I don't think the commission would ever adopt a definition that swept in every event. So involved then has to be gaming involving a contest of others. I imagine there are other, like video games, are referred to as gaming. I don't know. I don't want to limit it to sporting events and beauty pageants and elections. I can't say. People come up with new things all the time. But what it can include is every event contract. And there's nothing unusual- Understanding can include everything. We're trying to figure out what's in and what's out. We're trying to figure out what's the more deeper logic, other than the case-specific application of your position. And I thought it had a lot to do, from reading the order, that it had a lot to do with a fundamental distinction that I gathered is historical, just goes way back for the CFTC, between business-related hedging and betting in a more speculative gaming kind of way. And that's, you know, whatever sort of rough way that that's what this term is trying to get at it. This is just distinguishes, you know, whatever it is, FanDuel from an exchange-traded product. Yes. And I think, you know, there's not much in the way of legislative history. All there is, is this, you know, I understand how courts feel about colloquies, but what was said is that it's to prevent gambling on futures exchanges. Yeah. Did you even say a moment ago that one can bet on elections on FanDuel? Overseas. Overseas. Yeah. And, but the commission hasn't studied whether that has impact on the elections themselves or on the extent of false or distorting information being injected into electoral processes. No, and those aren't futures exchanges. Those are just more traditional casinos. I gave that as an example to illustrate that this falls in what, you know, we traditionally think of in common parlance as gaming. Great. Thank you very much. Thank you. Let's get a little bit of your time. I reserved three minutes for rebuttal, but that seems common. May it please the court, Yakov Roth on behalf of Kelshi. Your honors, in order to obtain a stay, the commission has to show two things, likelihood of success on the merits and that there will be some harm, irreparable harm absent the stay, and they can't make either of those showing. I'd like to start with the merits, if that's all right. Congress authorized the commission to block only those event contracts that involve certain specified activities. Elections are not on the list. And so their argument comes down to characterizing these event contracts as involving either gaming or unlawful activity. The problem as to both is that the commission's interpretations of how the statute works and what this language means are so broad that they would sweep in all event contracts, thereby rendering the other enumerated activities superfluous and flipping the whole structure of how this statute works. And they have not been able to give a limiting principle. They weren't able to give one below, and they still are unable on appeal to offer one that actually works. So I'd like to go through them one at a time. Start with gaming. We look at dictionary definitions of gaming. I think the court will find there are basically two. There's definitions that turn on a game, either playing a game, betting on a game, something to do with a game, the game-based definitions. And then there are also definitions that are broader that say, well, gaming is gambling. Of course, if the first definition is right, these contracts don't involve gaming because there's no game anywhere here. So they have to rely and turn to the broader definition and say, well, gaming means gambling. The problem with that, besides the fact that Congress didn't say gambling, is that gambling is too broad because gambling means wagering on any contingency. And if it covers wagering on any contingency, then any event contract is going to involve gaming in exactly the same way as these event contracts involve gaming. The difference is whether you are wagering to, I hate to use that word, that you are taking the event contract, staking your money to hedge against commercial risk or just to gamble, just so the exchange will get turned into an online casino or something. That seems to be the difference. That's what I draw from what little legislative history there is here, that what they really wanted to do was to allow people to protect against economic risks. But they didn't want people to be taking over the gambling industry. And that means just letting any member of the public come in and go, I'm throwing in money on this. And they're not hedging economic risk. And that's the whole point of these CFTC exchanges. Right. So, Your Honor, I think there's definitely something to that. And I think that supports the ordinary definition of gaming as involving a game. Because the defining feature of a game is that it doesn't have economic consequences outside the game itself. It has no extrinsic consequences. Whoever wins the Super Bowl, they'll be very happy. That doesn't have widespread economic consequences. So, it makes perfect sense if Congress wants to say, look, we only want these markets for things that really have economic effects to say games are out because games don't have economic effects. And all of the examples in the legislative history are games. Super Bowl, horse racing, golf tournament. These are things that don't have economic effects. Unlike elections, where it's conceded and undisputed that elections have enormous economic effects. Billions of dollars are spent on our elections. You've been very careful and lawyerly about saying that the defining feature of a game is that it doesn't have extrinsic economic consequences. I mean, they do, whether the arena moves to Virginia, whether giant purses and some of these games, they make or break all kinds of advertising and sponsorship. I mean, there's whole economies that hinge on games. But there is this familiar... I think Judge Millett's first question really went to this. There is this familiar difference between... It's not that it has economic consequences, but that it is fundamentally an economic activity. And I think one of the difficulties here, and I think that may be animating the... Surely animating the commission is that, yes, elections have economic consequences, but they are not principally and shouldn't be a business activity. If that's the case, their definition is an effort to draw that line. Your Honor, I think the problem is... I don't know how you get that from gaming. I think the definition of gaming does roughly track it because games... You're right, there may be some ancillary economic effects to a game, sort of collateral and attenuated, but that's not... I mean, a game is defined as something you do for amusement, for diversion, or sport. Gaming... I mean, I actually... This is where I actually think that... I mean, the district judge was under a lot of time pressure, but the notion that gaming involves games in the sort of football or monopoly sense seems not quite right to me. Gaming is a species of wagering, of gambling. And not all risks are gaming. But... So, I don't know. I mean, it does seem like there's some there there for the CFTC and its function is dealing with things like commodities that are... The value of which is constantly tracked and it's government reporting versus chances of elections or chances that so we'll have a next top 100 hit. Those are very different. So, let me say a few things about that. Number one, their definition of gaming has never had anything to do with this. Their definition of gaming, if you look at the order, is they say gaming is taking something of value on a contest of others. That's their definition. It has nothing to do whether it's the most important economic thing in the world and everyone wants to hedge it or has no economic impact. They talk about economic impact is in a different section of the order. Dealing with the public interest analysis and below we did raise a very robust challenge to their analysis and findings in that part of the order, which the district work didn't have to reach and didn't reach and didn't comment on. I will also... So, I don't think that's actually their theory. Their theory is means taking something on a contest of others and I'm happy to talk about why that can't be drawn from any of the sources they cite and doesn't actually make sense in this context, but I just want to make sure that's not their theory. The other thing I'll say is the record is full of not just hypothetical, but actual comments from businesses and individuals saying, I face political risk. My business faces political risk. I would buy these contracts to hedge my political risk. So, I don't know why the council was saying there's nothing in the record. It's just us saying that people are going to do this. I went through the volume that we provide to the court as the appendix to our opposition the other day. It is one letter after another of real companies saying, I have this risk. I will hedge this risk if I'm given the opportunity to do so. And that's not surprising because it is established and there's empirical evidence that elections have enormous economic impacts immediately before any legislation is passed, before any confirmations happen. The election itself causes certain companies to increase in value or decrease in value. That is the risk. And so, to hedge that risk, you would want to buy an event contract that accommodates that and that accounts... Other than elections, what contest of others would be a more traditionally recognized form of event contract that one would expect to see on the CFTC? Contest of others narrowing? So, I think you could have... If you're using the we're talking about the colloquial definition of a contest of others. I don't know. I'm talking whatever their definition is. Well, I don't know. I mean, that's part of the problem. So, we could have... I think a war is a contest. Well, we know that now. War is already listed. So, it suggests it's not a contest under this one. You could have a lawsuit and there are event contracts on who's going to win a lawsuit. Google has a big antitrust case. That matters to a lot of people. There are event contracts on these license exchanges on court case outcomes. I don't know for sure if there are. I know there are on legislation because your Honor asked about that. We have done contracts on it. I don't know if legislation is... I mean, I don't know where a contest of others is defined. I think you could have a corporate board, a corporate proxy contest, right, for board control. That would be a contest of others. You could certainly hedge on that. Again, I don't know for a fact if those have been offered, but they could. I mean, really just to take a step back, though, this contest of others thing is coming out of nowhere. That is not in any definition of gaming. Again, the definitions are either narrow to game or they're broad to gambling. There's no middle definition in any dictionary that they point to that says contest of others. Why is gambling too broad? Gambling is too broad because gambling is defined in both the dictionaries and the statutes as staking something of value on a contingency that would cover the universe. If it covers the universe, they've conceded it can't be right if their interpretation covers the universe. Is hedging economic risk staging something of value on a contingency? I'm just asking. Yes, I think it is.  Are you staking your money on a contingency? Is buying insurance staking your money on it? I'm asking about, I guess, about the verb of staking. I think you're doing both. I think you are hedging your risk by staking some money on a contingent event. That's sort of the premise that at least they're working from. I don't think that's incorrect. I think the problem is they're trying to have it both ways. They don't want to be stuck with game, but they also realize they can't say it's any time you stake money on a contingency. What is the principle that is going to distinguish, that covers us, but doesn't cover the waterfront? The only thing they've come up with is contest. I feel like most of the things that one thinks of as at least CFTC type contingent events are things that are not contests of others. They involve multiple forces coming together or unpredictable forces, whether some criminal event or a strike or things like that, but really are not. Right. I think the question then becomes, is that a plausible, is it the correct reading of the word to say gaming means staking money on a game or a contest of others, but nothing else? Where is that line coming from? I understand why they're saying it. They're saying it to sweep in us and not sweep in everything else, but where does it come from? It doesn't come from any distinction. It comes from the Kentucky Derby, PGA golf, Super Bowl example, and a very, very big appetite for gambling from lots and lots of sporting events- For sure, your honor. ... and competitive activities. That, to them, feels like main... Gambling, buying of insurance policies, it's not typically thought of as gambling. Buying a future to hedge against your farm exposure to weather is not typically thought of as gaming, but the Super Bowl situation, which was mentioned in the column, and your product strike them as things that are different. Right, but your honor, those three examples, they're games. Super Bowl is a game. Kentucky Derby is a game. Is a marathon a game? I think a marathon is certainly close enough to a game to be called a game. It's competition. It's a contest. It's something you do for diversion, entertainment, or sport, so it's a game. The question is, are elections like that or are elections like all the other events that have- Elections are not like insurance or events that happen to my product. Well, I'm not sure. I mean, they may be different from both. They have relevant distinctions from both, but I think the question is, if we're trying to define gaming, what is the definition that actually makes sense that has some source? And I understand if it's going to be- There's two separate things. I get it that you're arguing about the source, but then I thought you were making another argument that it's just not coherent or workable as a kind of functional matter. Well, let me make both points. First, I want to make the point that it doesn't have a principled source. It's not in any dictionary. It's not in legislative history. If you look at where they do draw it from, I think it's very telling. They draw it from some state laws, the state gambling laws, that use the term contest, and let me give you some context for those because they are so instructive on what is meant and what is not meant. There's only a few, actually, that use it. Delaware is one example. It refers to betting on the trial or contest of skill, speed, or power of endurance of human or beast. Louisiana talks about betting on a game, contest, lottery, or contrivance. When you look at those statutes in context, I think it's really clear. They don't mean contest to cover elections, just like they don't mean trial to cover a jury trial. That's not what they're talking about. They're talking about games and things like games. The second point, going to the policy of it, I do think it makes sense as a way for Congress to have drawn the line to say games as a general matter are things we don't want people betting on because they don't have extrinsic consequences. I'm not saying it's a perfect line. There's lots of things that people can bet on that aren't games that don't have extrinsic consequences, and there may be some games that do have extrinsic consequences. It's a rough line. It makes perfect sense, and the line they're drawing doesn't really make any sense because why would I be allowed under the statute to offer an event contract on how many times somebody is going to tweet during a presidential debate, but not on who's going to control the House when that actually has significant economic consequences that real people want to hedge? Wait, there are no contracts on how many times somebody... Yes, there are. On the exchange? Yes. Is that cited in your brief? There's a lot of... I mean, there's too many examples of that in our briefs. Can you say again? These are self-certified... I can't... CPMs that do this. I can't remember exactly who does what, but there are contracts. I'm sorry, I just didn't hear that. It was like how many times will a certain candidate tweet during a certain period of time? A certain candidate? President Trump. Okay, how many times will President Trump tweet during a certain period of time? I know there are contracts on that. I don't know who offers them. Does that have economic consequences? No, my point is it doesn't, but it's not a contest of others. So my point is there has... It's not gaming. No, it's not. So you could have event contracts... You could. ...without reading the statute. And my point is... But that's not something that's hedging economic risks. No, it's not. That's not what this is designed for. I agree. My point is... You couldn't ban it under your theory. That's right. Or under the commission's theories. Under either. Exactly. My point is their test doesn't track the policy. Our test does track it. And I take your point. It may not track it perfectly, but it tracks it and it aligns with the dictionary definitions that are what we're supposed to be looking at. I don't see any... To me, the notion that... And I know this is what the district court held, but that gaming is betting. It's not game. Your Honor, if you look at the dictionary, and we've surveyed a lot of dictionaries, it's playing games or playing games for stakes. Those are the most common definitions that you'll find in any dictionary. The common denominator is that there's a game. If you don't have a game, you definitely don't have gaming, unless you take the broader interpretation of gambling. And I fully acknowledge there are also definitions that say gaming means gambling, but that cannot work. Indian Regulatory Gaming Act involves... Involves games. It involves gambling. I mean, that's the legal issue. We can play games anywhere in the United States you want, but you go on to Indian country to have the special legal permission to do gambling, right? That's absolutely correct, Your Honor, and that proves our point, because that statute, we cited that statute, because it uses the term gaming, and it defines what is gaming, and there are things like blackjack and cards and games that you engage in for amusement. One-armed bandit. I don't know what that is. Slot machines. Yeah, slot machines are a game. Are they? Yeah, certainly, I think they're a game. Is it your position that the commission could or could not, or do you have a position on whether the commission could do a rule under the other enumerated categories? To add elections, Your Honor? Yeah. I don't have a position. I'm certainly not going to say they can, because I don't know what their theory would be or their logic, and I don't want to stake out a position, but they haven't tried. The proposed rule that they have, Your Honor, does not attempt to exercise their authority under that subsection of the statute. Their proposed rule merely essentially codifies the reasoning of their order in this case, so they have not tried to do that. How do we know that's not what they're doing? Well, you can look at the proposed rule. And that's where they get to make rules for... But they don't. I mean, Your Honor, if you look, if the court reads their proposal, their proposal is to define the term gaming. It's not to add to the list, which is a separate exercise, a separate power they're given under the statute. So that's just not what they're trying to do. They could certainly try. You made some reference in your reading to short-term manipulations. What... How quickly are manipulations of election betting markets corrected? And so what do you mean by short-term? So what I mean is the... Well, I was referring to their examples, really. I mean, their examples are situations where there was, you know, the one they give from Polly Market, it was about an hour or two where there was a spike and then it corrected. That's what we would expect to happen because someone's going to have an economic incentive to bring it back to the price that is the correct market price. Your Honor was asking about this market on a market because that is their... That's one of the few actual examples of any manipulation of these markets. So let me address that. The situation there was there was a market on the election, and then there was a second market on who would be ahead in the first market during a particular window of time. That is particularly susceptible to manipulation because you can tweak the first one on a short-term basis and then try to profit on the second. So let me make a couple of points about that. One, we have no contracts like that. We would never offer a contract like that. Number two, the CFTC would never allow us to offer a contract like that. It would never allow that because, and this is important to understand, this statute that we're talking about is not the CFTC's only authority to regulate event contracts. They have... There's an entire part of the CFR that sets out 23 core principles that designated contract markets like Calgary have to follow, including against market manipulation, position limits, all sorts of things that they have authority to regulate. And they would certainly say that a market on a market is inconsistent with those core principles and could not be offered. Two questions about that, though. One is, do you have to have a market on a market or couldn't just the price going up and down you can arbitrage on the first market? Yeah, so that's a separate thing. As in any market, you could try to do like a pump and dump, like I'm going to blow it up and then sell and quickly get out. And there is a concern raised, at least in theory, if not necessarily with reason of evidence, that that could happen at a really critical time. When there's the convention or a primary or early voting's about to close or S&T voting's about to close, that you could have a short-term dive that made it like, oh my gosh, my candidate really is going to lose or win. And I guess there's a real concern if there is some amount of however short-term that it could have significant impact. Okay, let me make a couple of, give you a couple of responses to that. Number one, based on the actual evidence of these markets existing in a lot of different countries for a long time, the best they've been able to come up with is this sort of one- to two-hour manipulation that we saw on poly market. And they don't translate that into any harm to anything else. The only person who actually lost from that was the person who tried to manipulate because they lost their money, market work. It's not any different than the risk that would exist with any market because there always is this theoretical potential. The more robust the market is, the harder it is and the less susceptible it is to that type of manipulation. But really the most important point I think I want to make is that the way to reduce that risk is to allow Cauchy's markets to operate. Because right now this activity is happening and being reported to voters based on markets that are not regulated, that are open to foreign traders, that have no surveillance, that we don't know, there's no transparency. We don't know who's buying, who's selling. It's done in cryptocurrency. If this was happening on Cauchy's markets, we would have this whole suite of regulatory provisions that apply. I mean, they make a very powerful argument on that though, which is regulating the integrity of this market is way outside their ordinary wheelhouse. Way outside. Your Honor, not in the sense that Your Honor was asking about because if somebody were to... Fake news, real news, origin of news. Let me separate those out for a moment because there's two different theories and they're kind of blending them all together. David, Your Honor was asking about the traditional market manipulation, buying and then selling. That would be caught in a second on a regulated market. We are required to have full-time market surveillance to prevent that type of manipulation. And if it was happening on a regulated market, the CFTC would prosecute that conduct. So that itself creates the deterrent impact. I do want to separate that out from the speculation about misinformation. This is a little bit different, but I think there's an equally powerful response to that, which is we have a lot of misinformation in the political marketplace as it stands. And that is because elections matter a whole lot. They don't matter because people are trading on them. People are trading on them because they matter. And we have, I think, a real problem with misinformation in the political marketplace. But a prediction market is one of the most important tools to actually combat the misinformation. Because the prediction market, the traders have an incentive to verify, to fact check in a way that is not susceptible to arguments about bias. That's why this is really a powerful tool to expose truth. Because if somebody comes up with a fake poll, if you're a good trader, you're not going to immediately buy or sell based on that. You're going to actually investigate it and make a reasoned judgment about it. And that is a way to actually... That is how businesses will make decisions if they are in it to hedge against economic risk. But unless you tell me otherwise, I don't know how you police who is coming on these exchanges and your exchange to buy, to verify, whatever it's called, to buy these event contracts, because I assume anyone can do it. Do you have to have a special license to come in and buy them? Or can anybody in the public do it? You need to open an account. And we do, we have... Anyone can come and open an account if they are a real person. We have Know Your Customer regulations. It's not like we're allowing, you know, foreigners to come in and open accounts they cannot. But yes, ordinary individuals can come and trade. Ordinary individuals may also have legitimate hedging needs. Many of them will not. And as with any market, there are going to be people who are there for speculation. And that is critical to the operation of any market to provide the liquidity. Uniquely attract non-commercial investors or purchasers, whatever you want me to call them. The people who just want to either express their support for their candidate, to run up the support for their candidate. I mean, after the election was called for Joe Biden in 2020, there's a market on which it was predicted that it went up, that Trump would win the election because his supporters were pouring in to make that statement. And it would have lost a lot of money. But I'm still struggling, I think, to understand. These people are doing lots of money, but it's like collectively it's lots of money. Yeah. I mean, the problem is, do you have any way of sifting those out? Do you have any way of ensuring that that individual that's on there isn't actually doing it as a front for a foreign government? What are your protections against these concerns? So it depends on what the concern is, Your Honor. If the idea is, look, people are going to come on, and they're uninformed, and they're going to spend money to favor their candidate, that could happen. I'm not sure what the public interest is in that or how it's different from anything else. This is a really reliable way to get accurate information about elections. Well, because that's the aggregation. Because if somebody comes in and does that, there won't be any... Except the aggregate. Their concern is that the aggregate is going to be people who aren't, who are doing this for political reasons, who are doing this for manipulative reasons, that it won't, in fact, be, you know, corporations that will be doing... There'll be some of them in there, but it's going to be wealthy individuals who want to, you know, make sure the next newspaper headline is, wow, look at what happened to candidate X. Your Honor, I think the best I can do in response to that is to say, we have had these contracts for a long time, these markets for a long time. They're really making it seem like this is this new... Not in this amount of money. Well... Sorry about that. I just wanted to say that. Can you answer my money? Go ahead. So two things on the money point. It is true that predicted has lower position limits. Polymarket has no position. So it's not true that there aren't... There's a billion dollars trading right now on U.S. elections, on polymarket, with no position limit and no regulation. And they think that advances the public interest somehow, as opposed to having that trading happening in a regulated way. The second point about the amount of money is the amount of money is partly a solution to the concerns about manipulation. Because the market that is least susceptible to manipulation is the one that is more liquid and large, because then an individual has less capacity to influence it. So it kind of cuts both ways on the size. But the third point on the position limit... $300 million, right? But let me address that, because that came up in the first half as well. The commission has authority over position. The position limit thing is, in my view, a complete red herring. In three years of dealing with the commission on these, they never said, well, our problem is the position limit is too high. If you brought that down, it would be fine. And they've never said that. They've never tried to say that. And they've never tried to use their regulatory authority over position limits to deal with... They could just knock it down to the $1,000 or something, so you're like... They have the power to do that. It's under... And you would have no objection or no challenge to them doing that. Well, I can't speculate, but I will say that it can't be arbitrary and capricious. But I will say... I'll just point, Your Honor, because it's 17 CFR 38.300 and 301. That's their position limits. All right, give me that slide again, please. 17 CFR 38.300 and what follows. That's the core principle dealing with positions. What you're doing here, exactly what calling market does, except with a $100 million limit in the United States, people can participate. And all the regulations. No, I understand that. But just what you're trying to do. I know it'll be regulated. And yeah, materially. I mean, I don't know if they have a congressional control contract. What we're dealing with here is congressional control. They may have that. I'm not sure. They have markets on all sorts of elections. The difference is it's unregulated. There's no checks. And you think that that's a large liquid efficient market? Pretty large, yeah. I mean, a billion dollars is a lot. Again, it may depend on which market, because they have different contracts trading. I don't want to make a categorical statement, but it's pretty big. Is there any evidence that activity on calling market has affected election integrity in any market? Because I guess it's not just the United States for calling market. Has anybody studied and come to the opposite? There have been extensive studies of these prediction markets. And they're in the record. They're cited in the record. I don't have a page number, because they're strictly across the whole thing. We provided the court with the parts of the administrative record that include the comment letters from professors at Harvard and MIT and Columbia who have studied prediction markets and all of whom support this. In fact, the blog post that they cite in their brief is written by two individuals who filed letters in support of these contracts and said they are a good thing that the commission should permit. I know I can ask more questions. Isn't there one more thing that's different than that is that these markets have the U.S. government imprimatur on them, and that it just seems inherently against public interest to have the U.S. government imprimatur and officially putting out on the market a device for gambling on its own elections? And I say gambling, I said that all those people who are not hedging economic risk. Your Honor, it has a certain imprimatur in the sense that it is regulated by the commission. I think that's a good thing, because it means there are checks on what can happen. It means there is transparency. It's not anything goes. There are tools available. I think that's important and a positive from a public interest perspective, not a negative. Now, could Congress make the judgment, look, we don't like this, it doesn't feel right, we don't like it, we shouldn't allow it? Sure. And if they added elections to the list, then we would not be here making a rational basis challenge to that finding. But a lot of people don't feel that way. The commission adds elections to the list. Well, then we may have a fight about that, but they haven't. I think for present purposes, though, I don't see how that can really qualify as irreparable harm sufficient for a stay, because it's completely non-falsifiable. Whether that's a good thing for the public interest, there are a lot of people who think it's a great thing for the public interest, and it actually boosts civic engagement in our democracy to have people have the ability to participate in these markets. Something that's allowed, not civic engagement, it's commercial engagement. No, but my point, Your Honor, is that there is research that is cited in comments that the ability to participate commercially has the effect of increasing civic participation, because people now have more of a stake in the election. If you wanted us to read, I mean, I've seen the comments, but if there's something that you think is particularly, of all the comments that you say, what would you read? I'm going to have to look. Professor? Well, it depends which point you're most interested in. So the point about hedging- I'm interested in the question whether there's anything affirmatively showing that short-term manipulations of election betting markets do not affect election outcomes. That's what I'm interested in. Affirmatively showing that it doesn't. Looking at all this that's been going on, this is happening, this is happening. I know what there is for sure in the record is comments, and we cite these in the briefing to this court, this day briefing, that the risk of actual manipulation, short-term market manipulation, happening is very remote on a pretty substantial liquid market like this. That is definitely cited from economists and experts- But that's sort of modeling. It's not, we've seen this in a country that allows it, and where it hasn't gone haywire. I'll have to check the right sites, because there is a lot, and it's on a lot of different points. So there's also comments about the economic impacts and the reasons for hedging, which was asking, but earlier we have the economists, professors commenting on that, and experts. So there's a lot in the record that is supportive. They only cite like three letters in the record, and they're from members of Congress who say, well, we don't like this. We think this is bad. There are other members of Congress who weighed in and said, we think this is great. But I think if the court looks overall at the record, there is really abundant support empirically for this. Of course, it's their burden at this point. We're not anymore at the point of challenging their finding as arbitrary and capricious, where we have to show they got it wrong. We did win this case in the district court, and it was not a rush. Forgive the comment. It was not a rush. We intentionally did not ask for a PI, so we didn't want to rush the process. We wanted the judge to be able to study this, look at the materials, look at the statute, understand it, and reach a decision in time for this election cycle. And so at this point, they have to convince the court with non-speculative evidence that this is going to be a problem. And they just haven't. I'm just responding to your pointing to this is happening, this is happening, it's not cutting the sky to fall, ubiquitous, large amount of money. And it stands to reason that there would be more money if your product is approved. Do you have any idea how much of the hundreds of millions that have been put into election vetting on polymarket? How much of that has been contributed by U.S. persons? I don't have a number. We know that it's widely reported that it's happening in large volumes, but I can't give you a number because we don't have access to that information. What happened when you opened your market for this short period of time? Last Thursday, we opened it. There was trading. It was about $50,000 in total of trading. How long was it open? It was open about eight hours total, but there was no advertising. And there was a whole period of 10 years when this public interest review was just gone away, but there wasn't any election outcome contracting during that time, as far as you know? I'm not aware of any that happened on a regulated exchange. The point about the availability of these other exchanges and the fact that this has been going on in the U.K. and Australia and New Zealand and Canada and so on, I think it is telling about their inability to point to anything. So that's the reason I bring it up, is to say it's not as if this is completely hypothetical and we all have to be guessing. It's not. It has been going on for a long time, large amounts of money, and they still are not able to point to anything other than this market-on-market one-hour manipulation that we talked about and this law review article that speculates that a poll may have been fake and maybe it was done to affect a small market on predicted. It's not evidence of anything. You make an assertion that event contracts specifically are presumptively valid and not subject to the commission's public interest review, and the basis for that is just that there's a special rule and so for everything else. Yeah, well, that you can self-certify the compliance. Self-certifying compliance allows you to list, and this is... And does the self-certification require you to make a public interest case? No, the self-certification requires us to certify that we've complied with the statute and the regulations. But it no longer requires a public interest case. There's no... Right. They took out the... Statute used to require upfront review for the public interest of every contract. They got rid of that, and that's part of our point. Well, they got rid of their active certification. I just... I haven't read the whole statute enough to know that they got rid of you having to satisfy yourself and put it in writing what the public interest is, but you're saying that that's been... That's my understanding. ...steered away. That's what... Yes, that's correct. We did... When we submit the... When we did the self-certification and submitted the contracts, there was a long appendix that includes all of the analysis of these and many other points. It sounds like we don't make the case there because we did expect the commission to go down this path and review it. So we did do that, but that's not how the statute works. The statute gives them the power to do this review only for the enumerated contracts. And just to jump back to the merits, their most fundamental problem is their interpretations of the statute would reverse that and turn up... Can you address, I guess, subsection one, activity that's unlawful under any federal or state law? Yes. Okay. Thank you, Your Honor, because I think there was just a little bit of confusion after that. So there are two ways that you can understand that part. Our way is the event, the underlying event, has to relate to something unlawful. Okay. That's what we think the statute means when it says the agreement, contract, or transaction involves activity. We think the reference is to the underlying event. The underlying event has to have that relationship to something unlawful. So, for example, you can't have a contract on what will the murder rate be in D.C. this year. The underlying is murders in D.C. It relates to that's unlawful. We don't want people profiting from... Isn't the underlying there official D.C. PD murder statistics, which are not unlawful? But it relates to. So this is why involving... We actually agree with the commission and the district court. Involve is broader than based on. It doesn't mean it has to be the unlawful thing. It has to relate to the unlawful thing. So that relates to the unlawful thing. Okay. Their interpretation is even if the underlying event has no relationship to anything unlawful, if trading the contract would be unlawful, then it's triggered under one. That's the disagreement on the interpretation of the statute. And there are two important reasons why our interpretation is right and theirs has to be wrong. The first is looking at this in context, given the activities that follow. So terrorism, assassination, and war. The only way a contract could involve terrorism, assassination, or war is if the underlying event has something to do with terrorism, assassination, or war, not trading the contract. Trading the contract is never going to be terrorism or assassination or war. So if you look at these together, there's a very strong inference that the work that Involves is doing in the statute is tying the underlying event to the listed activities. On their view, it's toggling back and forth between what it's referring to from one to the next, which is not a very good way to interpret a statute. The second problem. How is it toggling? I mean, you say you'll agree that it has to be related to. Yes. So how is theirs toggling? Oh, because they're saying, for number one, activity that's unlawful, they're saying that trading the contract has to be unlawful or relate to something unlawful. Then we go to terrorism, assassination, or war. I think what they're saying is that the contract involves, just to get to the election gambling theory, involves in that a consequence. That's one of the definitions of all that they list is consequence of a consequence of having those event contracts is that people are able to gamble on elections. They're not because there's no way. It's not self-limited to people who are interested in hedging against economic risk, the way droughts are, or there's going to be a hurricane. There's no way to limit it to the commercial function that these exchanges. I agree. I agree. I don't think we're disagreeing with your point. We're not toggling. They're just, I'm just, I'm not sure you're taking it. From one to two, three, and four. That's what I mean by toggling. So for number one, their test is figure out if it's a transaction that involves unlawful activity. We're going to ask if buying and selling the contract entails or relates to unlawful activity. Or has as a consequence. Or has as a consequence unlawful activity. Then for two, three, and four, we're going to ask whether the event that the contract is on relates to terrorism, relates to assassination, relates to war. So they're toggling between what we're looking at. Are we looking at- They're not toggling. They're just saying either or both. And some of them, we don't want you contracting on things that are tragic and horrific. But like, if you look at six, other similar activities determined by the commission by rule of regulation to be contrary to the public interest, the commission is not going to be determining that, you know, elections are contrary to the public interest. They're going to be determining whether using event contracts to wager on elections is contrary to the public interest. It's not- I mean, and if you think about it more broadly, they can't determine whether marijuana legalization is contrary to the public interest. And they're not doing public interest determinations on anything except the potential for trading in a contract that might be subject to their regulation, right? I'm not so sure- So that strongly supports their- So first of all, I'm actually not so sure that's right. They've never done it. So we're all kind of hypothetical as to what they would be talking about. But unlawful activity, terrorism, assassination, and war, those are all things that are bad. And the legislative history suggests we don't want people trading, profiting on things that are bad because that is just- it looks bad for people to profit from war. Right, we don't want people trading in that. So I could definitely- But trading is similar activity determined by the commission to be contrary to the public interest. The commission's determining what? Large sugar drinks and their market success is contrary to public interest or not? No, it's not their bailiwick. It's the trading, right? Your Honor, again, because they haven't done it, it's hypothetical. I'm really not sure that's right. Do you have a different way of saying that? Yeah, I think they could say, if you took the number one out, for example, you had terrorism, assassination, war, I think they could say, well, murder is not on there, but we don't want contracts on murder either, even if it's not an assassination. So we're going to add murder to the list. I think that would be perfectly fine. But what about if you didn't take one out? And so you don't have- look into state or federal law, what they already deem to be illegal. The commission is supposed to make a determination about underlying activities that are contrary to public interest. And on that ground, do a public interest review of contracts, any contracts related to that. I do think that's what the legislative history suggests, because the common thread was, we don't want people profiting from underlying events that are bad for public policy. That's not what it says. Number one is activity that is unlawful under any state law. And so there's a state that says no medical marijuana. Most states do, but there's a state that says, or two, I don't know what the number is, that even no medical marijuana. That's not a bad thing. This isn't a bad thing. Congress is doing something different here. Well, that state clearly thinks it's a bad thing. I'm trying to make sure these exchanges don't sort of take over and hijack areas traditionally regulated by the states. I don't know what else it means. All they have to do is find one state. Activity that is unlawful under one state law. Right. I think you're on a good track. I'm just asking to hear it all has to be inherently bad. Okay. Well, look, gaming is, I mean, I guess we all have different opinions. We all have different opinions about that one. But it's kind of a weird list. It's like any state law, and then horrible, horrible, horrible, and then gaming. I just don't know what this list is. The way I read the first one, at least, is, yes, if the federal government or a state has prohibited something, then we at least want the commission to be able to have the power to say, we're not going to allow an event contract on that thing. Because someone, some state thinks it's really bad. Okay. So medical marijuana. What are these exchanges meant to be with their imprimatur of governmental supervision and approval? And it's not to step on, you know, there's federalism interest here. I mean, the gaming is presumably a lot of federalism interest and tribal interest. And then you've got the sort of assassination war and terrorism. And then there's respect, again, for state law is the number one. It feels to me that it's, I just was reacting to your argument that this is all, you know, really, really bad stuff. And it's just not true. It's a more complicated list, at least as I read it. Well, let me, let me. And I guess the only coherence I can see, sorry, the only coherence I can see is that they are trying to have these exchanges remain commercial exchanges for hedging risk and not suddenly become online casinos. Displacing, by the way, gaming authorized or not by states. Or forums that sort of, you know, encourage activities, directly or not, that are unlawful. Otherwise, I don't know what the unlawful under state law is doing, because the event contract will never be the activity that's unlawful under state law. It's always going to be about creating market interest about. Right. But I think there's lots of examples of event contracts on events that have a relationship to an unlawful activity, like my murder rate example, or, you know, whether a particular CEO is going to be arrested for insider trading this year. That relates to unlawful activity on insider trading. How many pounds of illegal drugs are going to be seized at the border this month? Illegal activity. It relates to illegal activity. So they can say, we don't want to market on that. There's illegal activity going on. What it doesn't mean is that they can look to the state laws that prohibit trading, prohibit gambling, and saying, oh, well, states prohibit gambling, which they define to be staking something of value on any contingent event, and then subjecting them to public interest review, because that does cover every event contract. And that cannot be correct. Can you address sort of a specific state law that says betting on elections and how that could be set apart from just general gambling? They try to set it apart. I just don't understand where that comes from in the statute, logically or legally. The statute says unlawful under any federal or state law. So you have some state laws that say you can't wager on any contingency. You have some that say you can't wager on particular contingencies. You have some that say you can't wager on elections. From the perspective of the statute, I don't understand what the difference is between those things. Well, what about when we talked about it, can you finish, please, Joshua? Yeah, yeah, sure. So just if you're applying the same logic in those situations, I don't see the difference between a broadly worded- So the argument is that general contracts are preempted and specific ones may not be, if they promote a specific state interest, such as election integrity. So, Your Honor, the preemption works differently. The preemption comes into play if you have trading on a regulated exchange. State law cannot prohibit it because the CSCC has exclusive jurisdiction over that trading activity. So any contract that is offered on an exchange, regulated exchange, cannot be touched by state law, whether it's a general state law or a narrow state law. Isn't that saying the cart before the horse, though? They're not yet traded. They're not. No, that's right. When the commission is doing this inquiry, they're not. Correct. This argument doesn't make any sense to me. Well, their argument- No, no, your argument is saying their argument can't make any sense because there are also laws that outlaw event contracts and their whole business' event contracts. Therefore, it doesn't make any sense. But I think it's one thing to say, yeah, of course we don't mean to have- I mean, he said he's not going to take the whole authority to look at every and any event contract just because some state laws think that the business we're in is not worthwhile. But we're going to look at laws that express a concern about betting on elections or something. That is an objective and non-commissioned determined reflection of a state saying this is unlawful or the federal government saying this is unlawful. And that's the kind of thing that makes sense for them to say, okay, these are the subcategories things that Congress told them to do public interest- That is a judgment that our exchanges are not going to make our exchanges something that preempts that state interest. Your Honor, I just, I don't understand how that comes out of the language. The language says, does it involve activity that is unlawful under any federal or state law? Any. Okay. So if the question we're asking is focused on, as they say, trading the contract, would trading the contract involve activity that is unlawful under any federal or state law? That covers every event contract. Because trading any event contract is unlawful under at least the laws of 29 states that prohibit any event contract. So yes, he can stand up and say, oh, we wouldn't actually do that. Don't worry. But as a matter of statutory interpretation, that's not how it works. He needs to have a limiting principle that carves out something from something else that doesn't sweep the universe into number one, in which case, why do we even have two, three, four,  We're not, the statute allows the commission to find something that's illegal under state law. And these event contracts involve that. Right. So on their- Involvement, they get to make an upfront call about whether we want this, what our exchanges are designed for. Are they going to serve the purposes of these exchanges? Are they going to be something different? And in making that decision is the federal interest in having this opportunity to hedge against risk strong enough that it warrants displacing the state law judgments. And maybe that does mean that someone could come in someday and say, okay, we're going to get rid of all event contracts. And it'll be, I mean, there'll be more blowback than anyone can imagine. It'll probably take care of the problem itself. But if not, then there'll be challenges to it. That this was not meant to, this was meant to have subcategories here, not the entire category. You'll make those arguments. But that up, when we find something that's illegal under state law, and it's implicated by what's happening with these contracts in their view, these event contracts, they get to make that call. That is their position. They are- They get to make that first time. Yeah. Their position is exactly right. Their position is they can subject any event contract to public interest review. It doesn't mean they're going to ban them all. They can invent any event contract. And that's not normally the language of the state laws. That is unlawful. And the first show is unlawful under any federal or state law. Right. Which all of them are. Any state law. They can't find one state law to ban something. Does your position depend upon it being traded on an exchange? Because that's what you've been saying. And it could be unlawful under state law for me just to bet with my sister. It has nothing to do with an exchange. And this would involve illegal- State laws never talk about exchanges. The federal preemption comes into play if you're on an exchange. The state laws are general, but they have nothing to do with exchanges. They're just saying you can't stake something if a value- So why isn't this an agreement contract or transaction that involves an activity that's unlawful with that activity being betting on? Election. Because in our view, in order to avoid the consequence that every event contract falls within number one, you have to read the statute to be asking the question whether the underlying event involves unlawful activity. And the underlying event here is elections. Elections do not implicate unlawful activity. But why can't it be betting on election? Because then it is not any different from any other event contract. It is because of the public interest finding they're going to- Right. That puts the cart before the horse here. Well, public interest in that this is not commercial hedging of risk. There's no way to contain it to that by its very subject matter, whereas the drought or a hurricane's going to hit the whatever crop in whatever state, that's a different thing. But just by its very subject matter, you said this is a big civic interest in this.  It involves every person in the country who's involved in the organization. I can see that. Can't they say it's different? Sure. That goes to the back-end inquiry of does it advance or impair the public interest? In order to subject the contract to that determination and that analysis, they first have to find that it fits into one of these categories. Right. But all of this- Yes. I get that. Their position amounts to, their reading of the statute amounts to every event contract is subject to public interest review. That's the law. That was the law before Congress amended it. That would read this statute to revert back to the system that was in place before the statute was enacted where they have to approve every event. They have to review- But why isn't betting on elections in a separate category? Because it's not relying on general state laws that say you can't bet on contingent events. They probably have that too, but they've decided to also have a special rule, at least one state, that you can't bet on elections. That is motivated not by the public policy. We don't want people to do betting on stuff, but on this public policy about election integrity. Why can't that be a separate category from other things that are bet upon? Because there's a separate state law that deals with that. To be honest, some of them are separate. Some of them are not separate. All we need is one. Yeah, but I don't understand how that can be justified under this language. Because the language doesn't say- A lot of states will say we're doing it for public interest reasons, for election integrity reasons. And that's the very type of thing that the statute is- Nevada, which is like the gambling capital of the United States says, but not elections. And you're saying that the commission can't say that. And it's not one state. It's a lot of states that have even just separate provisions on election laws. A lot of states have a ban, gambling on elections. A lot of states ban, 29 states ban wagering on any contingency. The question is, can we distinguish the broad, no gambling state laws from the narrow ones? And I think that's what your honor's question is going to. So just let's imagine a hypothetical. Let's say a state said, and some states have this too. No wagering on agricultural things, okay? Because it's going to affect our agricultural price support system and integrity of our agricultural industry. We don't want wagering. That would somehow call for a different conclusion. That would allow the commission to step in and subject that to public interest. Here's what I think is a weakness in your argument, which is that if there's a state law, any state law in this country that says, do not bet on election outcomes. And the commission says, well, that involves, and actually that's unlawful of any state. That seems to be perfectly in line with this statutory language. And your argument is that means they can do it on everything else, but not necessarily if there's not a state, say there's a state that doesn't have any of these laws, let's say you can't gamble on anything else. Then this is tabid and contained. But your honor, as you said, you just need one. There are 29 and there were, these were in place when Congress enacted. So walk me through this. If they say an agreement contract or transaction that involves unlawful activity under a state law that says no betting, how do you, how would you take that and translate that into betting on the tweets? Yeah, it would mean they would subject that. Why? Why? There's no specific law about tweets. No, but it covers betting on anything. No, it doesn't. It covers betting on elections. The state law that we're relying on only covers betting on elections. So how does that lead to covering betting on tweets? No, that one, that one doesn't. But if you can make that argument about that statute, I don't understand why. But it doesn't go to betting on anything. If it doesn't go to tweets, it doesn't go to anything. It doesn't translate. The narrow doesn't go to the broad. The broad would go to the narrow. But here we've got the narrow state law that talks about betting on elections. And how does that mean you can now regulate everything? Because, so I think it's because all the commission needs to point to is a state law that renders unlawful the thing that they say the statute refers to. And there are, we know it's not disputed that some state laws outlaw all event contracts. I have just a technical question for you that will show my ignorance. Are all the contracts on designated contract markets event contracts? Or are like futures or derivative contracts? Are those something different? Like is it corn hedging, is it classic old commodities? So, Mark, is that an event contract or is it something? It's something else, Your Honor. Event contracts are these things where we're looking at, what is it? We only offer event contracts. So, Cal, she's a designated contract. And I looked at the event contract for us. It's a contract that is contingent upon an occurrence or extent of an occurrence. That's the definition. So, an occurrence is event. Is something going to happen or not? It's, there's, you could have an event contract that looks, right, that says, will the price of oil be above X on a certain date? It's just structured a little differently, I think, from a traditional future where you're promising to buy or sell at that price. They overlap. But these are events. What we're dealing with here is that. Is something going to happen or not? Right. Is something going to happen or not? It's yes or no. It's binary. Pays out if it has to, not if it doesn't. And I'm trying to understand if it has to pay X or Y. And is there a, you don't have a site for the definition, do you? 7 U.S.C. 1A bracket 9 and 19 are the two definitions. It's the definition section of the Act that defines the excluded commodity to include essentially an event. So, an occurrence, extent of an occurrence or contingency that is beyond the control of the parties and associated with economic consequences. And the election is or is not beyond the control of the parties? It is beyond the control of the parties to the contract. So, parties to the contract cannot. Determine the result of the election parties to the contractor. Kelsey and the person. They're not Kelsey. Kelsey is not a party to any of the council doesn't buy and sell. Whoever's buying one side. Yes, when you trade. Exactly. There's another reason why it's not gambling. There's no control. They all get to vote. What's that? If it's beyond the control, if they get to vote. I think that the thinking is, I think it is beyond the control. Of the parties to the contract because their one vote is not going to impact. It's not going to determine the outcome. Certainly, when you're talking about congressional. As a state, we're not that long ago. There was a state governmental contest where they literally had because they had an actual type of, they had to. I forget if they did a toss of a coin or something like that. It was crazy. Well, your honor, I think it happened. Yeah, I was contest, but some we're getting to pretty close margins in a lot of jurisdictions these times. So, I don't fair enough. Your honor, I think the consequence, if it was deemed to be within the control of the parties, I think the consequence would be that the commission doesn't have any jurisdiction over it because it's not within the scope of their power. But they've not, they just have never taken that position. So, we haven't briefed it and they haven't argued it. 1A9, that's the definition of commodity. Right. And then 19. 19. Yeah, there's two definitions in there. Why is it correct that the commission can regulate whatever under the statute, they can look at, make the finding about agreements, contracts or transactions involving actually that's unlawful under a state law that says no gambling on elections. And what you're positing is that if you do that, then you have to look at all the state laws that say any, I guess, wagers on contingencies. That's not really before us right now. Maybe if they tried to do that, there would be some limit. But your honor, I think we- That's not what they're relying on. Well, no, but I think the logic of the statutory interpretation is before the court. The court has to understand what the statute means. And again, our position is involves, requires you to look at whether the event, subject matter of the contract has the connection with the activity, just like we would do for terrorism, war and assassination. One way of looking at it, but it doesn't have to be the way you look at it in every case all the time. Right. So, and that's their position. And my point is, if you, if the court were to adopt that interpretation of the statute, the inevitable consequence as a matter of law would be that every event contract is subject to public interest review because they can make the same argument, exactly the same argument for every event contract. They just need to point to one state law that says you can't wager on contingencies. They've got 29. And all of a sudden we have five more categories that play no role. They would never have to rely on them. And instead of having a presumptive, presumptively allowed subject to review for these narrow categories, we have, though they can make a public interest determination as to anything, but maybe that- What real is this risk? Do you, do all 29 of those statutes clearly apply to, or do they carve out, or do lots of them carve out business transactions, commodity exchanges? Because when I looked, it was extremely small, the number that didn't do that. Many of them- In fact, the two states that ban all gambling have carve outs for business transactions and commodity contracts. Many of them have carve outs. Okay, so then that's not an issue because it won't be illegal under those states'  So tell me how many states- This is your risk. Your risk is you're going to be able to do this thing. How many states ban all gambling and have no carve out taxually, regulatorily, or through court decision for business contracts, event contracts, things like this that are hedging economic risk? I'll try to answer it as best as I can, Your Honor. I believe that many of the carve outs actually tie back to the federal scheme of regulation because what they're basically saying is, you're not allowed to do this, but of course, we're not trying to interfere with the federally regulated CFTC regulated exchanges. Those are not covered. It doesn't break it out, Your Honor. I'm sorry. I don't have the specific state by state. But there's no state that actually does that, and there's no concern. Your Honor, not all of them, as Your Honor pointed out, not all of them do have the carve outs. Right, but then we still have to- But then they have- That's the difficulty here. It's because we don't know how- They use vague terms, and we don't know how they're interpreted. They may not, in the face of the law, have something. A lot have it in the face of the statute. It could well be I didn't have the time to find that there are state regulations that carve it out, or court decisions. And so you're telling us about your main argument is, if you read it that way, half the United States can be blocked by the commission. And if that's not accurate under the law, and I'm betting your position would be if they were to say, oh, these states do it, and they have these carve outs, you'd go, no, they don't. And in fact, you argue back to the commission that a lot of these states don't actually extend to these activities. So I don't know how you can have it both ways. I'm just, I don't know that, I don't know that there is in effect the concern that you're raising, and I'm- Okay, Your Honor, look, I understand the point. Let me make, let me say two things. Number one, their argument on involves is that it's very broad. It doesn't have to actually be illegal. It's to just have a relationship entail consequence. They're positing a pretty loose relationship between the thing and the unlawful. Your Honor, how many cases does it say involved? Is it broad? It is. I'm agreeing. And I'm saying, so if you take this sort of broad approach, I think it would be sufficient for them to come in and say, this contract, this event contract entails or relates to wagering on a contingency, and therefore it's close enough for us to trigger category one and subject it to public interest review. They have to show it violates some state law. They don't have to show it violates. They would have to show it relates to, involves. It's just something that's outlawed by a state. Well, they try to muddy it up and say it only has to be loose. Okay. They have their definition of involves, but it doesn't have to be the same activity, the underlying activity. But I don't think, I haven't heard them say, he'll tell me if I'm wrong, that in fact, if it's lawful under state law, they can still apply. If they can't find a single state that has outlawed it, they can still apply Roman one. Is that what you just said to me? It's around the edges.  The other thing I'll say, the other thing I'll just offer on this is, I apologize I don't have a 50 state survey here for you. They didn't make this argument. They did not make this argument. This was not their decision. They have all these long citations, and then they actually have a footnote that says, you say, actually, the only state laws don't cover this. Right. But your honor, for purposes of the argument in seeking a stay and their arguments below, this wasn't something they said. And so it's not something that I'm, I don't have that information. I'd be happy to do that and provide it to you, because I think the follow on questions would be, all right, how many of these state laws have car votes? How many don't? And then with respect to the election vetting, how many of those are subject to the same car votes? Because often they're related. They're tied together. Unless you formally use the language wager or bet. And so they will then cross reference. Right. They cross. So maybe that does not. They will again have back out. And then, so then your honor, perhaps the consequence of that is that these contracts also don't involve unlawful activity because they're subject to the same car votes, because they do have economic effects. They are both sides, isn't it? Okay. Yes. But it's their burden to seek this extraordinary relief. They only need one state. And if I can find one state that doesn't have an express car vote, and there's been no showing. It could be. There's only so much I can do. I've got other things on my day job, regulations or court decisions that clarify, but there are in fact, some that have no textual car votes.  I got that. Right. Well, your honor, look, they have to, we had extensive litigation in the district court on the merits of this. They never made this argument. Did your submissions to the agency, because they reference you making these arguments. Those already include citations to states. There are many citations, but as your honor intuited, some of these statutes are. Complicated because there's different sections that cross cross-reference each other and so on. So this is an open question, whether the big problem of 29 states actually exists. Yeah. Well, look, I take your honor's point. That wasn't their attempt to distinguish the two. It just wasn't. And so I can't give you the answer of, yes, it's Pennsylvania that does it. That wasn't their argument. They are proffering what they told the district court. District court asked them repeatedly. How do you distinguish? If this is in, why isn't everything in? And their argument, the court can look at the transcript. Their argument over and over again was, well, we didn't decide that. We didn't decide that yet. That's not a limiting principle. That's just, you know, well, maybe next time we'll come up with something different. I think they need to do more in order to explain why this doesn't swallow the rule, because swallowing the rule is an untenable interpretation. They didn't do that. I mean, just to put this in perspective, this is about whether they're going to do a public interest review, threshold for public interest review. And you sound really confident that your product is very much in the public interest. And so it's, you know, I mean, it seems to me that it makes sense that Congress would have been pretty sweeping in, or a little bit loose, let's say, in what it says. If the commission has time and energy, it can do a public interest review on these categories. Right. Well, they used to be empowered to do it on everything. And then they were empowered to do it on nothing. And then they were empowered to do it on nothing. And this was the compromise. When you say everything, you mean all event contracts? All event contracts. They're all futures and everything. All event contracts. And then it was nothing. And then Congress said, no, these ones are the ones we want. So we need to figure out something that doesn't capture everything that fits into these categories. And I don't think they've done that. And it's both because of the swallowing the rule problem and because of the alignment of how the work that involved is playing with each of these categories. Yeah. I know your honor wasn't persuaded. Can I try a hypothetical? On number six, the thing that it feels to me like it's pretty explicitly is referring to what kind of contract would be regulated, not what kind of underlying. Well, yeah, again, again, again, I don't know. It's never, it's an open question because it's never been used. Can I offer a hypothetical to help explain our point about the language? So we use this in the district court briefing. If you had a movie theater that had a sign policy that said adult accompaniment of children required for any screening that involves horror, science fiction, drug use, or violence. Clearly, when they talk about the screening involving horror or involving science fiction, they're talking about the subject of the movie. What is being played? With respect to drug use, linguistically, that could mean, well, if people are taking drugs during the movie, we want adults there. But in context, you would never read it that way because the other two, the first two are clearly references to the content of the movie. That's really what we're trying to, the point we're trying to make here. When you're talking about contracts that involve terrorism, you can only be talking about contracts whose underlying event relates to terrorism. Same thing for assassination, same thing for war. So when you look at that as a whole, it would be very strange if Congress was expecting the unlawful category to play a fundamentally different role in the statutory, in the analysis that the commission is doing. I'm sorry, why is this, again, just a statutory thing? It sounds like they already can review all contracts, right? Because in connection with the listing of an agreement, the commission may determine that such agreements contract. So they're looking at them all, and they are looking at them all, and then they can, as they're looking at them as they come through, they go, wait, this one involves A, B, C,  No, you're all right. Respectfully, I think that's all right. The commission may determine that they are contrary to public interest if they involve one through six. Yeah, I'm just talking about all of that before. It sounds like in connection with the listing, and then there's no limitation on the agreements, contracts, or transactions. But in fact, in connection with the listing that are based on contingency, they can look, right? And then if they see that it involves one of these things, I mean, they may not look much. Maybe this is the quick notice that you give before doing it, but they look at everything beforehand. So they don't look at it. I mean, we self-certify. They may not, but they have the authority to. Well, they don't have the authority to determine that they're contrary to the public interest. I understand. They can look at whatever they want, but the question is, what can they do about it? And the thing they can do about it, what's that? Okay. But then it sounds like, but they do have the authority here to look at everything that's coming on and make sure it fits. It doesn't run afoul of one of these categories. And they don't have to, they could let it go even if it does. That's correct. That's correct. There's a two-step. They have to determine, does it fit within one of these six categories? If so, does it violate the public interest? So the public interest review is happening only if you are within one of these six categories. They agree on that. Right. And so we just have to figure out, and this. First, they have to look at everything that's coming in. Yeah, they look at it. They figure out, is it fit within one of these? And that's what happened here. We submitted the contract. They said, we think it might fit within one of these categories. We're going to now analyze it. We said, OK, go ahead. Analyze it. And then they issued the order saying, yes, it does fit within unlawful activity in gaming. Therefore, we're going to review it for public interest. And then they determined it was contrary to public interest. And when we sued, we said, it doesn't fit into those categories. And your public interest determination is arbitrary and supprecious. The court didn't reach that below because it didn't have to, because it agreed with us on the first step. One last question. You said much earlier on, I apologize for the time, that you guys had not hurried this in the district court, that, in fact, you wanted the district court to have the time to get it right, and you didn't seek a preliminary injunction. Are we allowed that same time to get it right? Well, Your Honor, here's what we did. No, no, I'm just asking you, why? I would like the court to get it right. I'm glad that the court is taking the opportunity to look at it. But we're in a rush there. And I'm wondering, it's all rush, rush. Now, I get there's this election coming, but you knew that you were going to have to go through this sort of prior approval process here. And I'm just wondering why we aren't given the same grace that you gave the district court. I definitely want the court to be comfortable, to be comfortable with that the commission hasn't made the showing they need to make. But the posture is a little bit different now because we do have a decision on the merits. They're the ones asking for expedited relief. And they need to show that they satisfy the factors. If we had lost, and we had come up and said, we want an emergency stay, we would be facing that same difficulty of asking this court for extraordinary relief on a limited time frame. And we would probably, we may have lost that. But that's not what happened. We won. And now it's on them to make the showing. And I don't think they have made that show. They have to make a showing for a stay.  We sued back in November 1st of last year. We did the briefing on summary judgment. And we said from the very time we filed the case, we would like a decision sufficiently in advance of the election so that if, so that we can, assuming we prevail, which we expected we would, because we were confident in the argument, we would have some time before the election for that decision to have meaning. You didn't factor in appellate review? You didn't factor in appellate review? We factored in the possibility of expedited stay briefing, but a full appeal is going to, as your Honor knows, is going to take another year or more. And that was, well, they didn't ask for expedited appeal. They asked for stay. I'm sure I can ask for that too. Okay. Any other questions from my colleagues? I had just one other question. You said that you invested millions of dollars in this. How much have you invested? There's a declaration on the, that characterizes the amounts from the CBO. What's that? You don't want to say that in court. Oh, I don't, I don't, I just don't remember. Seven or eight. Seven or eight. I believe was the total. That includes costs for employees who have been developing this. And how much money would you make on this, do you think? I don't know the answer to that. What, you make transaction fees? There are transaction fees on trades. They haven't been set necessarily. I mean, they can change. So I don't. It's a percentage of the trade or how much? Yeah. I just wanted to clarify one thing. This is about the, you know, presumptively subject to public interest review. Presumptively not. And then again, I thought that you said today that from 1974 to 2000, that then contracts were subject to public interest review. Weren't all contracts, any new contract that was going to be on a. That's possible, your honor. I don't. Was subject to public interest review. Yeah. And then that was suspended for 10 years. And now. So it's sort of like everything, nothing, select category. So it seems if that's right. Is it, it seems less than plausible that the subcategory being. Event contracts might be one that the commission and Congress got the broad authority to look at. Well, but your honor, the special rule is only about event contract. Right. Statute that we're talking about is only about event. So they want to say then contracts are subject to public interest review. They could say then contracts are subject to public interest review. They said commission may determine that they're contrary to public interest if they involve these categories, read the categories to be everything. Right. If you read everything, then all the work of the subcategory doesn't make sense.  Thank you very much. Mr. Schwartz, we will, we will give you a four minutes. Thank you. Dear reminders. That was a lot, but I'll try and keep it to just a few important things. It's not the most riveting part of this, but I really need to hammer home why they are wrong about the work that the word involved does here. The main reason is that the statute doesn't say it. We've been over that a lot. It would be very easy to write a statute that did say that involved the underlying. The statute would say that the contract has to be based on an occurrence that involves, but Congress didn't do that. There's a big gap between when they talk about the occurrence, the event, and when they talk about based on and involve, and involve is connected to the whole agreements, contracts or transactions. There's no logic there. The word involved, everybody agrees is broad. And so the fact that when you apply it to one item on the list or another, that it may or may not touch it in the same way is not surprising. The cases they cite deal with inconsistent use of a statutory term, not a term that touches one item on the list one way and another another way. RATSLEF is a case they cite. It is about whether or not a statutory requirement of willfulness in a criminal statute means that you have to know you're breaking the law. It was argued that although it does with respect to one law, maybe it doesn't with respect to the other law. A lot of RATSLEF, the Supreme Court said, no, no, no, no. It can't both mean you have this willfulness requirement here, but you have that willfulness requirement here. Here, I'll give you a silly example, right? Tennis involves a ball because you hit it back and forth. Tennis involves viewing stands because you sit on them to watch the game. But the fact that you wouldn't sit on the ball or volley the viewing stands back and forth does not mean you were using two different definitions of the word involved. It's just a broad word that can capture various kinds of relationships. It seems to me that the statutory interpretation issues are a little bit difficult, a little bit more tricky. But the weakest point for you is irreparable harm because you have to show irreparable harm, and I still don't. I mean, in your papers, you say the irreparable harm is related to election integrity and the perception of election integrity. And I don't see the connection between this rule, reveling in these markets, and problems with election integrity. I don't see it on this record. Given the concerns that were already expressed by commenters, if it's announced that now there is a new government-sanctioned venue where you can bet $100 million on elections, given everything else that this country has been through, I think it is entirely predictable that people will look at this with alarm, just like the people who happen to comment on our letters do. Alarm because their point on a lot of this stuff is, well, there's already a lot of money in elections. There's already foreign malign actors who are interfering in elections. So what's a little bit more? One is that there are markets operating, and that the markets, nobody in your submission, nobody has pointed to any effect of markets on election outcomes. I'm talking about the perception, though, whether it's rational or not, and I think it is. Why isn't the answer two weeks of them being up and running and everyone will calm down? I mean, we can all be afraid of what we don't know. And it just feels like, yeah, perception of unfairness is important. We all know that. But you don't have an opportunity to do more or an obligation to do more? I'll give you another. The thing that absolutely happens on day one is that the CFTC becomes the election cop legally because of our obligation to police these markets for fraud and manipulation, no matter what. How do you police them any differently than you would the earthquake contract? The earthquake contract? Well, there's really very little monkeying around you can do with an earthquake. But I will say that this, elections that get involved, investigating things having to do with political speech, they could involve- Wait, you invest, somebody bought butts. You're going to investigate what they did on the exchange. Not necessarily. We have anti-fraud and anti-manipulation authority over the underlying as well. So if you manipulate the price of corn off exchange, we have anti-fraud, anti-manipulation authority there. So somebody comes to- But it's underlying, but not everything that's involved. Well, if there were a credible allegation that somebody had spread misinformation in order to move the price of the market, that would be- If there's a fungus on corn, it's going to cause you to go blind. You would have to look into that. Well, it's possible. That's kind of an out there example. But entirely fraud in connection with- Do you investigate things like that? If somebody tells a lie and it moves the market, like there's going to be a new pandemic and it's monkey pox, do you go investigate monkey pox? I mean, it's going to happen. I will answer that by saying that false rumors are a time-tested market manipulation tool. And if you go back over the course of this- I'm just trying to get a sense of what you actually investigate, because your friend on the other side said there are two different types of things. One thing, it's easy for you to investigate things like a market on a market and trying to move prices, but you're saying that you're going to be the election cop, meaning you're going to go and stare it out as journalists do, whether the things people are saying are true or not. Is that what you're saying that you're going to do? It could put that. I'm not saying we're going to, because we're very ill-suited. But do you do that? Like if somebody says they want to move the price of pharmaceutical company stocks or whatever, make it a future, and they say there's going to be a monkey pox pandemic, and it's originating in the labs of Abbott. Do you go and investigate Abbott? We'll assume that we're talking about something in our jurisdiction. It absolutely could be something. You do that. You have actually investigated companies. People make companies that have made false statements to people that they are interacting with, whether it's- Are they false economic statements? Are they false scientific statements or political statements? It's typically economic, and that's the point, right? Because if the accusation is he wanted to manipulate the market, so he took a bunch of ballots and stuck them in a drawer on election night, who's supposed to do that? I mean, it would be within our jurisdiction if this comes to pass. You would have discretion to draw lines about what you investigate and what you don't. Yes, and the answer could be we just let it go, and whatever goes on the Cal-SHEA election gambling market goes. It could be investigated by other agencies, not just one in the government. But they might not necessarily be interested in the same things that would draw our attention because they're involved. Well, you can refer to them, and they either think what happened was bad or not. But bad for what? If it was very bad for the market, that would really put a lot of pressure on us for good reason to do something about it. But investigating things that may involve election-related activity is really, really far afield from anything else we do. And that's the point there. Any other questions? All right. Thank you. Thank you. Both counsel very much. We know this was done on very short notice, and we're grateful to the assistance you both have provided. Thank you. The case is submitted.
judges: Millett; Pillard; Pan